UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYDNEY FREDERICK-OSBORN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TWITTER, INC., and X CORP.,<br><br>Defendants. | Case No. 24-cv-00125-JSC<br><br>**ORDER RE: MOTION TO DISMISS**<br><br>Re: Dkt. No. 13 |

Sydney Frederick-Osborn, a Twitter former employee, brings a putative class action against Twitter, Inc. and its successor X Corp. ("Twitter" or "Defendants") for sex and age-based employment discrimination. Defendants' motion to dismiss is now pending before the Court. Having considered the parties' briefs and having had the benefit of oral argument on March 21, 2024, the Court **DENIES** Defendants' motion to dismiss the sex-based discrimination claims and **GRANTS** the motion for the age-based discrimination claims.

## BACKGROUND

**A. Complaint Allegations**

Plaintiff worked as a staff software engineer at Twitter from June 2022 until November 2022. (Dkt. No. 1 ¶ 9.)[1] She is a resident of San Francisco, California and in her late 50s. (*Id*. ¶¶ 9, 34.) Plaintiff's performance "met the Company's expectations" throughout her employment with Twitter. (*Id*. ¶ 9.)

---

[1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

In late October 2022, Elon Musk purchased Twitter. (Dkt. No. 1 ¶ 20.) Following the purchase in early November 2022, Musk immediately began a mass layoff through a Reduction in Force ("RIF") that affected more than half of Twitter's workforce "under extremely hurried circumstances." (*Id*. ¶¶ 20-22.) Data show the RIF disproportionately affected women and employees aged 50 and over. (*Id*. ¶¶ 24-25.)

After the initial layoffs in November 2022, Musk implemented several policies (the "Post-RIF Policies"), including expecting employees to "work an unreasonable number of hours" and requiring employees to immediately return to work in physical offices, even though Twitter had allowed remote work throughout the pandemic and even before that. (Dkt. No. 1 ¶ 27.) Since these demands were implemented in parallel to mass layoffs, they signaled to employees "these extraordinary efforts were required" to keep their jobs. (*Id*. ¶ 29.) Media reports following Musk's acquisition indicated Twitter employees were working 12-hour shifts, seven days a week. (*Id*. ¶ 28.) Some employees slept in Twitter offices while being required to work around the clock. (*Id*.)

On November 16, 2022, Musk sent an "ultimatum" email asking employees to choose either (a) agreeing to his new expectations and requirements by clicking "yes" or (b) leaving the company with "three months of severance:"

> Going forward, to build a breakthrough Twitter 2.0 and succeed in an increasingly competitive world, we will need to be extremely hardcore. This will mean working long hours at high intensity. Only exceptional performance will constitute a passing grade.
> . . .
> If you are sure that you want to be part of the new Twitter, please click yes on the link below:
> [LINK]
>
> Anyone who has not done so by 5pm ET tomorrow (Thursday) will receive three months of severance.
>
> Whatever decision you make, thank you for your efforts to make Twitter successful.
>
> Elon

(Dkt. No. 1 ¶ 31.)

The ultimatum resulted in 36% of the remaining female employees and 28% of the male employees leaving the company. (*Id.* ¶ 32.) The Post-RIF Policies and Musk's ultimatum made Plaintiff feel she was no longer welcome at Twitter, given her sex and age. (*Id.* ¶¶ 33, 34.) Plaintiff did not click "yes" and was laid off the next day. (*Id.* ¶¶ 34, 35.)

Twitter's new owner and CEO Musk has a history of making sexist and ageist comments. (Dkt. No. 1 ¶¶ 36-41.) Before he purchased Twitter, Musk made jokes about women's breasts, including in 2021 naming a school using the acronym "TITS". (*Id.* ¶ 37.) He also promoted the idea women should be "having a lot of babies" through tweets such as "[b]eing a Mom is just as important as any career." (*Id.* ¶ 38.) After he purchased Twitter, Musk tweeted "testosterone rocks ngl [not gonna lie]" within weeks of announcing the mass layoffs. (*Id.*) A few months later, he had the "w" on the sign of Twitter headquarters painted white so that the company's name appeared to be "Titter." (*Id.* ¶ 39.)

As for his ageist animus, Plaintiff cites a statement Musk made in a 2022 interview:

> I don't think we should try to have people live for a really long time. That it would cause asphyxiation of society because the truth is, most people don't change their mind, …they just die. So, if they don't die, we will be stuck with old ideas and society wouldn't advance . . . [a]nd it is just impossible to stay in touch with the people if you are many generations older than them.

(Dkt. No. 1 ¶ 41.)

**B. Procedural Background**

Plaintiff filed a complaint on behalf of herself and other female Twitter employees and employees aged 50 or older who were "constructively discharged from their jobs during the chaotic months following. . . Musk's purchase of the company in late 2022." (Dkt. No. 1 ¶ 1.) Plaintiff's allegations are against Twitter Inc., and X Corp. has successor liability for Twitter Inc. after their merger in or about March 2023.

Plaintiff brings sex-based discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12900, *et seq.* (*Id.* at 10.) Plaintiff brings age-based

1    discrimination claims under the federal Age Discrimination and Employment Act ("ADEA"), 29

2    U.S.C. § 621, and FEHA.  (*Id*. at 10-11.)

3         Plaintiff alleges she filed an administrative charge of sex discrimination under Title VII

4    and age discrimination under the ADEA with the Equal Employment Opportunity Commission

5    and an administrative charge of the FEHA claims with the California Civil Rights Department.

6    (Dkt. No. 1 ¶ 42.)

7         Pending before the Court is Defendants' motion to dismiss all of Plaintiff's claims for

8    failure to state a claim.  (Dkt. No. 13.)

## LEGAL STANDARD

A complaint should be dismissed under Rule 12(b)(6) if it lacks sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted).  A claim is facially plausible when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In considering a motion to dismiss, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  If a court grants a motion to dismiss, leave to amend should be granted unless the pleading could not possibly be cured by the allegation of other facts. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## DISCUSSION

A plaintiff claiming employment discrimination can proceed under either of the two theories:

1. "Disparate treatment" is when "the employer simply treats some people less favorably than others because of their [protected class]," and "proof of discriminatory motive is critical."

2. "Disparate impact" involves employment practices that are "facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." "Proof of discriminatory motive. . . is not required under a disparate-impact theory."

4

*Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n.15 (1977) (cleaned up).

Here, Plaintiff alleges both theories, claiming Twitter implemented policies "intentionally (or unintentionally) affected and forced out" a higher proportion of women than men and employees aged 50 and older. (Dkt. No. 1 at 10-11.) Defendants urge Plaintiff fails to state a claim under either theory. They assert the Complaint does not support a plausible inference for a layoff or constructive discharge because Plaintiff voluntarily resigned by not clicking "yes." (Dkt. No. 13 at 21.) Further, Defendants insist Plaintiff fails to plead sufficient facts from which a plausible inference of discrimination can be drawn. (*Id*. at 15-25.) Drawing reasonable inferences in Plaintiff's favor, Plaintiff has pled facts sufficient to support plausible inferences of a layoff and sex-based discrimination, but not age-based discrimination.

**I.    SEX DISCRIMINATION CLAIMS**

**A.    Disparate Treatment Theory**

A plaintiff alleging disparate treatment "must show the employer's intent to discriminate, but intent may be inferred from circumstantial evidence." *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1435 (9th Cir. 1984) (citations omitted). "Unlawful" employment practices under Title IV encompass "any situation in which a protected characteristic was 'a motivating factor' in an employment action, even if there were other motives." *Costa v. Desert Palace,* 299 F.3d 838, 848 (9th Cir. 2002). A plaintiff may establish a *prima facie* case for disparate treatment either through circumstantial evidence by meeting the four-part test laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973), or by providing direct evidence suggesting the employment decision was based on an impermissible criterion. *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009). The four-part test requires a plaintiff to allege she: (1) belongs to a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Moran v. Selig*, 447 F.3d 748, 753 (9th Cir. 2006).

At the motion to dismiss stage, a plaintiff need not present a *prima facie* case but must merely allege facts plausibly suggesting an entitlement to relief. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002). *Swierkiewicz* remains good law in the Ninth Circuit even after the

Supreme Court's clarification of pleading standards in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Iqbal*, 556 U.S. 662. *See, e.g.*, *Starr v. Baca,* 652 F.3d 1202, 1215-16 (9th Cir. 2011); *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1050 n.2 (9th Cir. 2012).

California courts apply the Title VII standard and analysis to discrimination claims under the FEHA. *See Guz v. Bechtel Nat. Inc.,* 24 Cal. 4th 317, 354-56 (2000) (explaining "[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes" and applying Title VII discrimination cases to a FEHA discrimination claim); *Bradley v. Harcourt, Brace & Co.*, 401 F.3d 267, 271 (9th Cir. 1996) ( "California relies on federal discrimination decisions to interpret the FEHA.").

### i. Plaintiff alleges she suffered an adverse employment action.

For claims of disparate treatment under Title VII, an adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of ... employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000)). Plaintiff has plausibly pled she suffered an adverse employment action when Twitter terminated her employment.

Plaintiff did not click "yes" in the ultimatum email and was "laid off" the day after. (Dkt. No. 1 ¶¶ 34-35.) The email's language that "[a]nyone who has not done so by 5pm ET tomorrow (Thursday) will receive three months of severance" supports an inference for involuntary termination. The email does not ask or require employees to resign affirmatively but only for them to click "yes" to show their acceptance of the new working conditions. (*Id.*) Moreover, "severance" is not usually provided for voluntary resignation. (*Id.* ¶ 31.) Drawing inferences in Plaintiff's favor, she was involuntarily terminated, which constitutes an adverse employment action. *See Davis*, 520 F.3d at 1094 ("[I]t is clear that [the plaintiff] suffered an adverse employment action when she was laid off.").

Defendants attempt to characterize Plaintiff's termination as "voluntary" because the ultimatum email gave employees an option to remain employed by clicking "yes" and committing to Musk's new requirements of being "extremely hardcore" and "working long hours at high intensity." (Dkt. No. 13 at 20.) However, Plaintiff took no affirmative action to terminate her

1   employment—instead, Twitter terminated Plaintiff because of her inaction. So, drawing
2   inferences in Plaintiff's favor, Twitter unilaterally terminated her employment. Defendants'
3   argument to the contrary improperly asks the Court to draw inferences in their favor.

4   Plaintiff also alleges her termination as constructive discharge. (Dkt. No. 1 ¶¶ 1-2.) The
5   inquiry for constructive discharge is objective: "[d]id working conditions become so intolerable
6   that a reasonable person in the employee's position would have felt compelled to resign?" *Penn.*
7   *State Police v. Suders,* 542 U.S. 129, 141 (2004) (citation omitted). It is thus usually "a factual
8   question left to the trier of fact," and courts have decided this question to be insufficient as a
9   matter of law when only a "single isolated instance" of employment discrimination is alleged.
10  *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (citation omitted). Here,
11  Plaintiff alleges numerous discriminatory actions by Twitter, including the RIF, which she alleges
12  disproportionately impacted female and older employees, the Post-RIF Policies requiring in-
13  person, long-hours and intense work, Musk's ultimatum email, and its owner and CEO Musk's
14  public sexist and ageist statements. (Dkt. No. 1 ¶¶ 23-32, 37-41.) The "heightened and
15  unreasonable demands" made Plaintiff feel "she was no longer welcome at Twitter, given her sex
16  and age." (*Id*. ¶¶ 10, 34.) She did not click yes in the ultimatum email and was laid off the next
17  day. (*Id*. ¶¶ 34-35.) Drawing inferences in Plaintiff's favor, a reasonable person in her position
18  could have felt compelled to resign given the changes in her working conditions. Plaintiff has
19  sufficiently pled she was constructively discharged, which constitutes an adverse employment
20  action. *Jordan v. Clark*, 847 F.2d 1368, 1377, n.10 (9th Cir. 1988) ("if shown, constructive
21  discharge is an adverse employment action.").

22  Defendants argue Twitter's new expectations and requirements of employees "working
23  long hours at high intensity" was not sufficiently "intolerable" or "extraordinary and egregious" to
24  constitute a constructive discharge. (Dkt. No. 13 at 15.) However, this is again improperly asking
25  the Court to make a factual finding and draw inferences in Defendants' favor at the motion to
26  dismiss stage. The two cases cited by Defendants were decided on summary judgment and after
27  trial. *See Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (summary judgment);
28  *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (bench trial).

7

1    Drawing all inferences in Plaintiff's favor, Plaintiff suffered an adverse employment action
2    when she was involuntarily terminated or constructively discharged for not clicking "yes."

### ii. Plaintiff sufficiently pleads a disparate treatment claim.

Plaintiff's factual allegations plausibly support an inference of sex-based discrimination. Plaintiff belongs to a protected class and her performance "met the Company's expectations" throughout her employment with Twitter. (Dkt. No. 1 ¶ 9.) And she has alleged a plausible link between her termination and her sex by alleging Musk's sexist public statements and the ultimatum's disproportionate impact on female employees. Musk's alleged sexist statements, especially the tweet "Being a Mom is just as important as any career," plausibly support an inference that Musk knew the Post-RIF Policies and the ultimatum email's conditions would be less acceptable to female employees who, according to him, should not prioritize their career over family obligations. (*Id*. ¶ 38.) Accordingly, drawing inferences in Plaintiff's favor, these facts plausibly support an inference Musk, the owner and CEO of Twitter, had a discriminatory intent to have more women than men "forced out of the company" when he implemented the Post-RIF Policies and sent out the ultimatum email because he expected women to be less committed to their career and thus less likely to consent to these changes. (*Id*. ¶ 36.)

Defendants insist Plaintiff fails to state a claim because she does not allege sufficient facts about her performance or the comparative qualifications or performance of male employees who were not terminated. But, as alleged, her termination was a result of an ultimatum email that does not reference any consideration of past performance in the decision-making process. (*Id*. ¶ 31.) The termination was based solely on employees' willingness and ability to consent to Musk's new expectations and requirements. Viewing the Complaint's allegations in the light most favorable to Plaintiff, her performance or comparative performance with her male colleagues was not a motivating factor for her termination and, therefore, not relevant to the analysis.

Defendants' reliance on the order granting the motion to dismiss in *Strifling, et al. v. Twitter, Inc.*, Case No. 22-cv-07739- JST (Dkt. No. 14 (Ex. 1))[2] is unpersuasive. In *Strifling*, the

---

[2] The Court may take judicial notice of matters in the public record, which includes proceedings in other cases. *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002).

plaintiffs were female employees laid off in the RIF. (*Id.* at 6.) The *Strifling* court dismissed the plaintiff's claims in part, because plaintiffs did not plead facts about their performance to allege similarly situated men were not laid off. (*Id.* at 11-12.) But the allegations here are distinguishable from *Strifling*. First, Plaintiff's performance and comparative qualifications with male employees are less relevant here. As the *Strifling* order recognizes, "the Court addresses Plaintiffs' allegations of their job performance not because it is a required component of every pleading, but rather because Plaintiffs rely on it to speak to the plausibility of their claims." (Dkt. No. 14 at 11, n.6 (Ex. 1).) Here, Plaintiff does not rely on her performance to show her claim is plausible. Unlike the *Strifling* plaintiffs, who were laid off in the RIF, (*Id.* at 5-6), Plaintiff was terminated after she did not consent to Musk's new expectations and requirements of being "hardcore" and "working long hours at intensity" in the ultimatum email by clicking "yes." (Dkt. No. 1 ¶¶ 31-34.) So, the process for Plaintiff's termination did not involve consideration of performance like the *Strifling* plaintiffs. Second, the *Strifling* plaintiffs were laid off in RIF by managers who were granted discretion, (Dkt. No. 14 at 13 (Ex. 1)) while Plaintiff here was terminated as a direct result of an ultimatum sent by Musk, as well as the Post-RIF Policies he implemented. (Dkt. No. 1 ¶ 31.) The circumstances surrounding Plaintiff's termination allow for the inference Musk's intent—which can be inferred from his public comments—played a direct role in her termination.

Plaintiff has pled facts to plausibly support inferences of discriminatory intent against women behind the Post-RIF Policies and the termination. Defendants' motion to dismiss Plaintiff's sex-based discrimination claim under the disparate treatment theory is therefore denied.

### B. Disparate Impact Theory

"In order to make a *prima facie* case of disparate impact under Title VII, the plaintiffs must show that a facially neutral employment practice has a 'significantly discriminatory' impact upon a group protected by Title VII." *Paige v. California*, 291 F.3d 1141, 1144 (9th Cir. 2002) (cleaned up). This showing consists of two parts: "(1) a specific employment practice that (2) causes a significant discriminatory impact." *Id.* at 1145.

Plaintiff has pled a *prima facie* case here by alleging a specific employment practice of "the imposition of the unreasonable hours and in-office requirements," (Dkt. No. 24 at 23), which caused a significant discriminatory impact on female employees at the time: 36% of whom were terminated compared to 28% of male employees. (Dkt. No. 1 ¶ 32.) Defendants urge Plaintiff's alleged Post-RIF Policies are "too vague and generic to constitute a discernible employment practice for disparate impact purposes." (Dkt. No. 13 at 20.) Yet their cited cases do not support this argument.

The Supreme Court has clarified the requirement for a plaintiff to identify a "specific" employment practice for disparate impact claims is to ensure plausible causation between the employment action and the disparate impact to avoid holding employers liable for "the myriad of innocent causes that may lead to statistical imbalances in the composition of their workforces." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989). In *Wards Cove*, the plaintiffs alleged "a variety of petitioners' hiring/promotion practices—e.g., nepotism, a rehire preference, a lack of objective hiring criteria, separate hiring channels, a practice of not promoting from within" were responsible for "a disproportionately low percentage of nonwhites in the at-issue positions." *Id*. at 647, 657. The Supreme Court found this to be insufficient because the plaintiffs failed to show "the disparity they complain of is the result of the employment practices they are attacking, specifically showing that each challenged employment practice has a significantly disparate impact on employment opportunities for whites and nonwhites." *Id*. For example, the Court questioned if the statistics of the racial imbalance was in fact caused by "a dearth of qualified nonwhite applicants (for reasons that are not [the employer's] fault)." *Id*. at 651. Here, in contrast, Plaintiff has identified the practice as Twitter's Post-RIF Policies and Musk's ultimatum email requiring very long hours and intense work, which led to the disproportionately large number of female employees being terminated. The disparate impact is supported by statistical data specific to the termination of employees who did not click "yes" in the ultimatum email, not a bottom-line imbalance of the entire workforce. The alleged facts are specific enough to avoid the Supreme Court's concern of holding an employer liable solely for a bottom-line statistical imbalance. *See id*.

Defendants' citation to *Stout v. Potter* is also unavailing. In *Stout*, the Ninth Circuit held the plaintiffs' attack on their employer's "overall decisionmaking process" for promotion was not sufficiently specific because the screening process included several "discrete elements" such as requirements of 11 validated competencies for the position and applicants' supervisor evaluations. 276 F.3d 1118, 1124 (9th Cir. 2002). The court contrasted the case with *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971), where the Supreme Court recognized a disparate impact claim challenging the use of general aptitude tests and a requirement of a high school diploma for promotions. *Id*. at 1125. Plaintiff's allegations here are more like *Griggs* as she is not attacking the blackbox "overall decisionmaking" of Defendants' termination of Plaintiff, but Post-RIF Policies' specific requirement of long, intense, and in-person work. Musk's ultimatum email further shows the expectation of "hardcore" and "intense" work was a requirement for employees to keep their jobs.

Defendants further urge Plaintiff's termination was not plausibly caused by the Post-RIF Policies because the "separations that arose from the Post-RIF Policies were voluntary" and "necessarily reflect[] countless individualized decisions by employees." (Dkt. No. 13 at 20.) This argument is asking the Court to draw inferences in Defendants' favor, which contravenes the legal standard for motion to dismiss. As discussed above, Plaintiff has sufficiently pled she was involuntarily terminated.

Accordingly, the motion to dismiss Plaintiff's sex-based discrimination claim under the disparate impact theory is denied.

**II.  AGE DISCRIMINATION CLAIMS**

The standard and analysis for sex-based discrimination in the preceding section apply to the age-based discrimination claims under the ADEA and the FEHA. *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (applying Title VII discrimination analysis to ADEA claims). Plaintiff brings discrimination claims on behalf of herself and other employees aged 50 and older under both disparate treatment and disparate impact theories. However, Plaintiff fails to sufficiently plead these claims.

11

### A. Disparate Treatment Theory

Plaintiff has pled some facts here similar to her sex-based discrimination claims: (1) she belongs to a protected class, (2) her performance was satisfactory (or her performance was not relevant in the context of her termination that did not consider past performance), and (3) she suffered an adverse employment action when she was terminated by Twitter. (Dkt. No. 1 ¶ 9, 26-30.) Nevertheless, she fails to plead facts that support an inference the adverse employment action was caused by age discrimination.

The Complaint contains no facts supporting an inference more employees aged 50 or older were terminated for not clicking "yes" in the ultimatum email. Plaintiff only alleges the initial RIF had a statistically significant adverse impact on older employees and, generally, "older employees were laid off in greater proportion than younger employees, and many older employees were forced out of the company after Musk's acquisition." (Dkt. No. 1 ¶¶ 25, 40.) While Plaintiff tries to tie this result to the Post-RIF Policies and the ultimatum email by alleging "Musk would certainly have known these policy changes and expectations would. . . force older employees out of the company," she provides no facts to support this statement. (*Id*. ¶ 30.) In her pleadings for the sex-based discrimination claims, Plaintiff identifies Musk's public statements on women's careers and family obligations to support an inference of such knowledge. But here, the one example of Musk's alleged ageist comments is about old people's reluctance to change their minds and embrace new ideas in the context of a longevity discussion, which does not directly address older people's willingness or ability to commit to long and intense work. (*Id*. ¶ 41; Dkt. No. 14 at 34 (Ex. 3)[3].) Accordingly, Plaintiff does not allege facts sufficient to plausibly support an inference Musk knew older employees were less likely to accept his new expectations and requirements in the Post-RIF Policies or that implementing such policies would force them out.

Plaintiff may state a disparate treatment claim through the "pattern or practice theory," but her pleading is also inadequate for that theory. To plead a "pattern or practice" discrimination claim, a plaintiff must demonstrate unlawful discrimination has been a "regular procedure or

---

[3] A court may consider documents incorporated by reference in the complaint without converting the motion to dismiss into a motion for summary judgment. *U. S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

1  policy" followed by an employer. *Int'l Bhd. of Teamsters v. U. S.*, 431 U.S. 324, 360 (1977). The

2  claims cannot be based on "sporadic discriminatory acts" but rather must show discrimination was

3  the company's "standard operating procedure the regular rather than the unusual practice." *Id*. at

4  336. Here, Plaintiff only alleges three acts by Twitter which Plaintiff contends disproportionately

5  impacted older employees: (1) the RIF, (2) new work requirements imposing extraordinary

6  burdens, and (3) Musk's company-wide ultimatum. (Dkt. No. 24 at 22.) But Plaintiff does not

7  allege the ultimatum email led to more older employees being terminated. Nor does she allege

8  any facts to illustrate an overarching and system-wide pattern of age discrimination at Twitter.

9  Plaintiff's cited cases also do not support her position. For example, in *Keys v. Humana,*

10 *Inc.*, the Sixth Circuit reversed a dismissal of a "pattern or practice" claim after concluding the

11 plaintiff's complaint "detailed several specific events" for each of the employment actions where

12 she received discriminatory treatment: hiring, compensation, promotion, discipline, and

13 termination. 684 F.3d 605, 610 (6th Cir. 2012). Unlike Plaintiff's Complaint, the *Keys* complaint

14 alleged a system-wide pattern across five different employment actions. *See id.*; *see also Doheny*

15 *v. Int'l Bus. Machines, Corp.*, No. 23-CV-3962 (RA), 2024 WL 382142, at *7 (S.D.N.Y. Feb. 1,

16 2024) (acknowledging "[w]ith respect to motions to dismiss, courts have held that three instances

17 of discrimination were insufficient to state a plausible pattern-or-practice claim, as were six

18 instances, but that eleven or twelve instances were sufficient."). Plaintiff thus fails to allege age

19 discrimination was Twitter's "standard operating procedure."

20 **B. Disparate Impact Theory**

21 Although Plaintiff alleges a specific employment practice of "the imposition of the

22 unreasonable hours and in-office requirements," (Dkt. No. 24 at 23), she fails to plead a disparity

23 that was "the result of the employment practices [she is] attacking." *See Wards Cove*, 490 U.S. at

24 657. As discussed in the preceding section, Plaintiff does not allege the post-ultimatum email

25 termination led to more employees aged 50 or older leaving the company. She only alleges more

26 older employees left the company "after Musk's acquisition," without tying the alleged disparate

27 impact to a specific employment action. (Dkt. No. 1 ¶ 40.) This falls squarely into the situation

28 the Supreme Court cautioned against in *Wards Cove*: as it may result in "holding employers liable

1    for the myriad of innocent causes that may lead to statistical imbalances in the composition of
2    their workforces." 490 U.S. at 657.
3          At oral argument, Plaintiff cited *Connecticut v. Teal*, 457 U.S. 440 (1982) and argued she
4    did not need to plead statistics to survive the motion to dismiss.  In *Teal*, the Supreme Court held
5    an employer's written examination requirement in its promotion process barred disproportionately
6    more black employees from consideration for promotion.  457 U.S. at 445.  The Court concluded
7    the disparate impact of one discrete element in the promotion process—the written exam—can
8    support a racial discrimination claim even when the overall rate of black employees being
9    promoted was not lower than that of white employees.  *Id*. at 451.  The Court held disparate
10   impact need not be measured at the bottom line because Title VII "strives to achieve equality of
11   opportunity by rooting out 'artificial, arbitrary, and unnecessary' employer-created barriers to
12   professional development that have a discriminatory impact upon individuals." *Id*.
13         Plaintiff appeared to suggest even if she could not show with statistics the Post-RIF
14   Policies and the ultimatum email had an overall disparate impact on older employees, her pleading
15   should still survive the motion to dismiss because there could be discrete elements of the Post-RIF
16   Policies and the ultimatum email that "create a discriminatory bar to opportunities" for the older
17   employees just like the written examination requirement in *Teal*.  475 U.S. at 450.  However, her
18   alleged facts are distinguishable from *Teal* because she does not identify any discrete elements of
19   the Post-RIF Policies or the ultimatum email that caused older employees to leave the company.
20   Instead, her alleged disparate impact is a bottom-line measurement—more employees aged 50 and
21   above left the company "after Musk's acquisition." (Dkt. No. 1 ¶ 40.)  As discussed above, the
22   pleading deficiency does not come from the lack of statistics but her failure to show the disparate
23   impact—alleged as a bottom-line measurement—is the result of the Post-RIF Policies and the
24   ultimatum email rather than the RIF, which also happened after Musk's acquisition and was
25   allegedly "statistically more likely" to choose older employees for layoff. (*Id*. ¶ 25.)
26         Accordingly, Plaintiff's age-based discrimination pleading fails to state a claim under
27   either the disparate treatment or the disparate impact theory.  But it is possible for her cure the
28   pleading deficiencies by alleging other facts.  *See Lopez*, 203 F.3d at 1127.  Defendants' motion to

dismiss Plaintiff's age-based discrimination claims is thus granted with leave to amend.

## CONCLUSION

Drawing reasonable inferences in favor of Plaintiff, she has sufficiently pled the sex-based discrimination claims under Title VII and the FEHA. The Court **DENIES** Defendants' motion to dismiss the sex-based discrimination claims and **GRANTS** the motion to dismiss the age-based discrimination claims with leave to amend the age-based claims. Plaintiff shall file her amended complaint, if any, by April 25, 2024. The initial case management conference scheduled for April 17, 2024 is continued to May 30, 2024 at 1:30 p.m. via Zoom video.

This order disposes of Dkt. No. 13.

**IT IS SO ORDERED.**

Dated: March 29, 2024

JACQUELINE SCOTT CORLEY
United States District Judge