*ORIGINAL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JACQUELINE SCOTT CORLEY, Judge

| | | |
|---|---|---|
| SYDNEY FREDERICK-OSBORN,<br>on behalf of herself and<br>all others similarly<br>situated,<br><br>            Plaintiff,<br><br>  vs.<br><br>TWITTER, INC., and X CORP.<br><br>            Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Motion to Dismiss**<br><br><br>Pages 1 - 40<br><br><br>NO. C 24-00125 JSC<br><br><br>San Francisco, California<br><br>Thursday, March 21, 2024 |

**REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM WEBINAR:**

For Plaintiff:          Lichten & Liss-Riordan, P.C.
                        729 Boylston Street, Suite 2000
                        Boston, Massachusetts  02116
                  BY:   SHANNON LISS-RIORDAN, ATTORNEY AT LAW


For Defendants:         Morgan, Lewis & Bockius LLP
                        One Market, Spear Street Tower
                        San Francisco, California  94105-1596
                  BY:   BRIAN D. BERRY, ATTORNEY AT LAW


Reported By:      Raynee H. Mercado, CSR No. 8258


     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1   Thursday, March 21, 2024                        10:01 a.m.

 2                      P R O C E E D I N G S

 3                        (Zoom Webinar)

 4                           --o0o--

 5

 6        THE CLERK:  Good morning, everyone.  Court is now in

 7   session, the Honorable Jacqueline Scott Corley presiding.

 8      Calling civil action C24-0125, Frederick-Osborn versus

 9   Twitter, Inc.

10      Counsel, starting with plaintiff, will you please state

11   your appearance for the record.

12        MS. LISS-RIORDAN:  Good morning, Your Honor.  Shannon

13   Liss-Riordan for plaintiff.

14        THE COURT:  Good morning, Ms. Riordan.  Or good

15   afternoon to you probably.

16        MS. LISS-RIORDAN:  No, I'm in San Francisco.

17        THE COURT:  All right.  Good morning.

18        MR. BERRY:  Good morning, Your Honor.  Brian Berry

19   for defendant.

20        THE COURT:  Good morning.

21      Okay.  We're here on Twitter X's motion to dismiss.

22      And I want to separate out this even the gender claim, sex

23   claims from the age claims because I think the analysis is

24   different.

25      But let's first start with defendant argues that the
```

1    plaintiff hasn't plausibly alleged constructive discharge.

2    And you do, Ms. Liss-Riordan, in paragraphs 1 or 2 call it a

3    constructive discharge, but then also refer to it as a layoff

4    or a termination later on.

5        And I guess, Mr. Berry, I'm wondering why drawing all

6    inferences in plaintiff's favor -- it's not just a

7    termination.  But I mean, "If you don't check this box 'yes'

8    by 5:00 p.m. tomorrow, you're terminated."  Why -- why isn't

9    that just a flat-out termination?

10        **MR. BERRY:**  It's -- it's not, Your Honor, because

11    there was a decision that was made.  And as alleged, I don't

12    think there's any allegation that there was -- there was

13    something about the process with -- with clicking the email

14    that resulted in a termination.  This was --

15        **THE COURT:**  Okay.  This is the email from -- from --

16    from Mr. Musk.  "If you are sure you want to be part of the

17    new Twitter, please click 'yes' on the link below.  Anyone who

18    has not done so by 5:00 p.m. tomorrow, Thursday, will receive

19    three months' severance."

20        That is saying if you don't click the link "yes," you will

21    be fired and get three months' severance.  Isn't that true,

22    drawing all inferences in plaintiff's favor?  Not it could be

23    inferred somewhere else.  Certainly that means that.

24        **MR. BERRY:**  Yeah, I mean, I don't -- I don't -- I

25    don't think so, Your Honor.  I think that the -- the decision

1    to remain employed was before each of the -- before plaintiff

2    and the others who received the email.  And they made an

3    election.  Some of them elected to remain employed, and some

4    of them elected to not remain employed.

5            **THE COURT:**  Well, okay.  I don't -- if the email

6    said, by -- you need to -- this is -- nowhere the -- the

7    allegation.  You need to cook the books tomorrow by 5:00 -- by

8    5:00 p.m., and if you don't, you'll get three months'

9    severance.  Also a construct -- just an election to quit?

10   Not -- not a termination?

11       I mean, I don't understand, Mr. Berry.  I mean, click the

12   box "yes" or you're terminated.  It's not like the allegations

13   are "she said I don't want to work here anymore," or that --

14   she was given a choice, an ultimatum, as alleged in the

15   complaint.  "Click 'yes' on this box or you're fired."

16       I don't understand why that's not a plausible inference to

17   be drawn from that allegation.

18           **MR. BERRY:**  Yeah, I don't think it is because

19   there's -- there's a decision to be made.  Do you want to work

20   here or -- or do you not want to work here?  And so that's

21   not -- that's not a termination.

22           **THE COURT:**  You're drawing inferences, Mr. Berry, in

23   Twitter's favor.  This is a motion to dismiss.

24           **MR. BERRY:**  Understood.  And so --

25           **THE COURT:**  What -- what case do you have that says

1    there's no way as a matter of law that this could be construed

2    as a termination, that she was fired for not clicking "yes" on

3    the box?

4          **MR. BERRY:**  Well, that -- the -- the argument that

5    you're -- that you're raising, Your Honor, I don't think was

6    clearly presented by Ms. Liss-Riordan's papers.

7        The -- the allegations, both in the complaint and in the

8    opposition brief, are about the constructive discharge arising

9    from these policies that were implemented as opposed to the --

10   the sort of format of the "click 'yes'" in the email.

11       And so --

12         **THE COURT:**  No.  I'll read the first line of

13   paragraph 32.  The ultimatum, referring to the email, was

14   intended to and did result in further layoffs -- a layoff

15   being another word for a termination, not a constructive -- I

16   agree, the complaint is -- at times calls it's a constructive

17   discharge.  I don't know why.  But -- but other times --

18                    (Simultaneous colloquy.)

19         **THE COURT:**  -- layoffs.

20       But notwithstanding that, just looking at the facts in

21   that email, which is pled in paragraph 31, why isn't -- why

22   drawing all inferences in plaintiff's favor -- not that it is

23   or it isn't -- just drawing -- why isn't that -- can't not

24   plausibly allege that she was fired for not checking "yes" on

25   the box.

 1          Anyone who has not done so by 5:00 p.m. tomorrow will

 2    receive three months of severance.

 3          **MR. BERRY:**  Yeah, I -- I mean, I guess -- I -- I hate

 4    to just repeat myself, and I -- I hear you -- I hear you that

 5    you disagree with it.  I -- it was not -- that issue, it was

 6    not briefed and we'd welcome an opportunity to brief it, but

 7    it was not --

 8          **THE COURT:**  There's nothing to brief --

 9                      (Simultaneous colloquy.)

10          **THE COURT:**  No, I'm just asking Mr. Berry.

11       Common sense, right?  This is just common sense.  Just as

12    a person, I just don't see, is there any -- I don't know how

13    to do that.  But put that aside.  I think it does.

14                      (Simultaneous colloquy.)

15          **THE COURT:**  I don't think that there's any way --

16    yeah.

17       But even the constructive discharge, because that's

18    actually what she pled in paragraphs 1 or 2, why isn't working

19    seven hours or seven days a week, 12 hours a day, extremely

20    hard-core, 84 hours a week, having to sleep overnight at the

21    work, why aren't those conditions sufficient to plausibly

22    support constructive discharge?

23          **MR. BERRY:**  There are a few reasons.  One is those --

24    the way that's alleged is not actually a policy.  It's an

25    instance that -- that it was reported that some people were --

 1    were doing that.

 2         In the immediate, as the plaintiff says in the complaint,

 3    sort of chaos that -- that -- that happened during the

 4    transition of -- during the acquisition and shortly

 5    thereafter, there were some events that were happening in --

 6    in the acquisition that required people to work longer hours,

 7    and there was some press reporting about some folks spending

 8    the night at the -- at the workplace.

 9         There is no allegation that it happened with this -- with

10    the plaintiff in particular or that this was any genuine

11    ongoing policy, as opposed to there were some folks who were

12    expected to work long and were working long and hard hours

13    during that time period.

14              **THE COURT:**  Well, Mr. Berry, what then, from the

15    complaint -- I have to draw an inference from Mr. Musk's

16    email -- "We will need to be extremely hard-core.  This will

17    mean working long hours at a high intensity."

18         I took, again -- this is just a motion to dismiss.  I must

19    draw all inferences in plaintiff's favor, not Twitter's favor.

20    You may be right, but -- that the paragraph 28 is informing

21    what the plaintiff is alleging, "extremely hard-core; this

22    will mean working long hours at high intensity" means.

23              **MR. BERRY:**  Yeah, I don't -- I don't -- I don't think

24    that there's any case law that suggests that that could

25    constitute a constructive discharge, that working long -- many

```
 1    people work very long hours, work six, seven days a week.
 2    It's a -- it's commonplace in a lot of --
 3         THE COURT:  Really?  Because you know what?  I would
 4    quit.  I mean, right?
 5         MR. BERRY:  Well, if you --
 6         THE COURT:  Come on.  Again, Mr. Berry, just speak to
 7    me as a human being --
 8              (Simultaneous colloquy.)
 9         MR. BERRY:  I'm trying to level with you, Judge
10    Corley.  I'm just saying the case law that they cited and that
11    we reviewed and the body of law around constructive discharge
12    requires egregious, intolerable, extraordinary conduct, right?
13        And I don't think that being asked to, you know, work long
14    hours is -- is so extraordinary and egregious that it would --
15    that an objective person would override their -- as one court
16    said, you know, override their ordinary desire to go to work
17    and -- and earn a living.
18         THE COURT:  Really?  Really?
19        So if I draw all inferences -- I agree with you.  I'm sure
20    some of your associates at times worked 84 hours a week.  I'm
21    equally sure they don't do it every week.
22        So, again, if I'm drawing all inferences in plaintiff's
23    favor, though, right, it's not -- I can't say, well, it was
24    just a one-time thing, like you said.  It would just refer to
25    this point at the -- at the takeover.  That, I understand.
```

1   But I'm drawing all inferences in -- in plaintiff's favor

2   here.

3           **MR. BERRY:**  Understood.  I think that there is --

4   there is no allegation that Ms. Frederick-Osborn was asked to

5   or expected to work 84 hours.  What's being -- what's being

6   reported -- I mean, I understand that in the posture of the

7   case, you need to draw all inferences.  But I think we're

8   stacking inferences upon inferences upon inferences in order

9   to get to Ms. Frederick-Osborn, that she was -- it was

10  communicated to her that she had an expectation that that

11  would be her job.

12          **THE COURT:**  Well, what is extremely hard --

13  hard-core?  Extremely hard-core?  This will mean working long

14  hours at high intensity, right?  That's what was communicated

15  to her.

16          **MR. BERRY:**  Correct.  And I -- I -- I don't think

17  that comes anywhere close to the grounds for constructive

18  discharge, being asked to work -- being extremely hard-core,

19  working long hours intensely and in -- in a physical office,

20  which is another piece of this that's --

21          **THE COURT:**  Yeah, I didn't mention that.  I didn't

22  mention that.

23          **MR. BERRY:**  Yeah.

24          **THE COURT:**  But -- so I mean, that is the -- what

25  does that mean to her, right?  What does she interpret that?

1      So, Ms. Liss-Riordan, what about that?  I mean, you don't

2  have any actual -- you cite those articles but don't actually

3  even say what they all necessarily say.  Or maybe I'm thinking

4  of something else.

5      What do you say to that where he says working long hours

6  isn't -- can't rise to a constructive discharge?

7          **MS. LISS-RIORDAN:**  Well, I think you just said it

8  perfectly, Judge Corley.  You would quit if you had an

9  expectation of working 84 hours.

10      It was clear or at least you can draw the inferences from

11  our complaint that it was clear that it was being communicated

12  to employees that these extremely intense work hours would be

13  expected.

14      We included some examples of the types of information the

15  employees were receiving about what might be considered to be

16  adequately hard-core, which was working 84 hours and sleeping

17  in the office.

18      And we have allegations in the complaint that these were

19  intentional circumstances that Mr. Musk set up in order to

20  continue the layoffs that he started a couple weeks earlier,

21  to weed out the people who he thought weren't hard-core

22  enough.  And this was perceived by many people, including

23  Dr. Frederick-Osborn, that older women were not particularly

24  welcome, that he was looking for young men --

25          **THE COURT:**  Well, that's a conclusion --

```
 1                      (Simultaneous colloquy.)

 2          MS. LISS-RIORDAN:  -- who were willing to do this

 3   hard-core.

 4          THE COURT:  Yeah, but I guess --

 5          MS. LISS-RIORDAN:  That was how she took it.

 6          THE COURT:  Well, what's missing, though, is --

 7   what's missing is what she -- paragraph 28, it doesn't even

 8   allege that she was aware of those things, right?  I mean,

 9   maybe an inference could be drawn, but that's what --

10                      (Simultaneous colloquy.)

11          MS. LISS-RIORDAN:  I think it could be inferred that

12   this was the circumstance under which she was asked will you

13   click this link by 5:00 p.m. tomorrow.

14          THE COURT:  Okay.  All right.  I understand that.

15     All right.  So then let's move to the age discrimination.

16   And unlike the sex discrimination, you actually don't really

17   allege anything specific to the ultimatum and age, right?  It

18   all has to do with the reduction in force.  You say that

19   disproportionately impacted older than 50, but you don't have

20   anything with respect to the ultimatum.

21          MS. LISS-RIORDAN:  Well, we had -- we had the

22   statistics that we were able to cite in the complaint.  This

23   is of course prediscovery.  So we included those statistics

24   related to the sex disparity between how many people accepted

25   and didn't accept.
```

```
 1              THE COURT:  Yes.

 2              MS. LISS-RIORDAN:  You don't need statistics in a

 3     complaint.  That -- that can come through discovery.

 4         We do -- because we have the statistics showing that the

 5     initial reduction in force that happened a couple weeks

 6     earlier did have a statistically greater impact on older

 7     workers, particularly workers age 50 and over, that is an

 8     allegation that Mr. Musk was forcing out older workers.

 9         So his --

10              THE COURT:  Well, I don't know --

11                   (Simultaneous colloquy.)

12              THE COURT:  -- that you want to go there.

13                   (Simultaneous colloquy.)

14              THE COURT:  Now we're going -- now we're going to

15     land right into Strifling which you're trying very hard with

16     this complaint to go around.  And the problem was --

17                   (Simultaneous colloquy.)

18              THE COURT:  -- there the courts dismissed because

19     Mr. Musk wasn't making the decision as to who was being laid

20     off.  It was the managers who had the discretionary decision.

21     This is the ultimatum and what are the facts in this complaint

22     that support a plausible inference --

23              MS. LISS-RIORDAN:  Yes.

24              THE COURT:  -- that that ultimatum was designed to

25     disproportionately impact employees older than 50?
```

```
 1              MS. LISS-RIORDAN:  Okay.  A couple of things.

 2         First let me just say this about Strifling.  Judge Tigar

 3    gave us leave to amend, and we did amend.  And the motion to

 4    dismiss, the amended complaint is now pending before him.  So

 5    that is still out there.

 6         As we said, we respectfully disagree with some of what he

 7    put into that.  Obviously I think the CEO and owner of a

 8    company who was stating what the new rules are going to be

 9    around here, that is looked at by the subordinates who are

10    making the decisions about who is -- who remains employed and

11    who gets let go.

12         But anyway putting that aside, to answer your question

13    about this particular complaint, we have allegations here that

14    a woman who is over 50 felt that this ultimatum was designed

15    to force out people who are not young and male like

16    Mr. Musk --

17              THE COURT:  That's not --

18              MS. LISS-RIORDAN:  -- wanted.

19              THE COURT:  Your subjective feeling is not going to

20    get you Iqbal, Twombly.  That's not plausibility.  That --

21                   (Simultaneous colloquy.)

22              MS. LISS-RIORDAN:  Yeah.  No, no, no, no.  But in

23    addition, we have allegations about not just sexist,

24    misogynist things that Mr. Musk said, but we have allegations

25    about ageist things that he said, that people shouldn't get
```

1    old, old people stunt society, or something like that.

2         She did not feel welcome.  She did not feel that he

3    expected women and older workers to be part of this hard-core

4    concept that he was trying to turn Twitter 2.0 into.

5         So those ageist -- the allegations about the ageist

6    remarks he made is enough to state a plausible claim, at least

7    for purposes of a motion to dismiss.

8              **THE COURT:**  There's one.  One remark from 2022

9    interview in paragraph 41.  That's all that's alleged in the

10   complaint.

11             **MS. LISS-RIORDAN:**  Yeah -- yes.  And if I can just

12   speak to that for a minute.

13        Yes, it is one remark that was made in the months leading

14   up to Mr. Musk's very public, very turbulent acquisition of

15   Twitter.

16        When you -- when you're talking about the person who is

17   the owner of the company, the CEO who is the ultimate

18   decision-maker, you can't disregard this as a stray remark.

19   He has made sexist comments.  He has made ageist comments.  He

20   is the decision-maker here.

21        The stray remark doctrine, which has been roundly

22   criticized, it can't be used to dismiss a claim on the

23   pleadings.  We get discovery on this to find out what --

24   because intent -- I mean intent is a intensely fact-intensive

25   question.  We have an allegation here that the ultimate

1    decision-maker harbored discriminatory animus both towards

2    women and towards older workers.  That should be enough for --

3         **THE COURT:**  Yeah, I'm just talking about the age.

4    I'm just talking about the age.  But what we don't have is

5    that a disproportionate number of older workers did not click

6    "yes," respond to the ultimatum and therefore were terminated.

7         **MS. LISS-RIORDAN:**  Right 'cause we -- we don't know.

8    We don't know.

9         **THE COURT:**  Well, that's okay.  You can't bring a

10   lawsuit if you don't know.  You have to have --

11        **MS. LISS-RIORDAN:**  No, no, no, no.  But we do --

12   here's the thing.  We do know that we do have the statistics

13   for the November 4th layoff which did have statistically

14   significant greater numbers of older workers being laid off.

15   So it carries forward that the ultimatum two weeks later is

16   intended to further what happened a couple weeks before.

17   That's in the complaint.

18        So this is a little disjointed.  So let me just sort of

19   step back and explain something about what's going on here.

20        Okay.  So obviously we have filed many complaints against

21   Twitter.  There are, I think latest count, about a dozen of

22   them pending in the Northern District of California.

23        We attempted to relate the discrimination cases to one

24   another because we do think there are overlapping issues, but

25   Judge Martinez denied that request.  We attempted to add

1    Dr. Frederick-Osborn to the *Strifling* complaint because she

2    had sex discrimination claims that overlapped with those sex

3    discrimination claims.   Judge Tigar struck

4    Dr. Frederick-Osborn's allegations from that complaint because

5    that complaint is about the November 4th RIF.   So we said

6    okay.   Well, she can't be in that.   We'll have to start a new

7    case.   And unfortunately because of Judge Martinez's decision,

8    these cases are all separate cases before different judges.

9          So on the one hand, what Twitter is trying to do is

10   microfocus each case on a particular allegation.   So the

11   *Strifling* case has been limited now to the November 4th RIF.

12         And Judge Tigar said you can't include any allegations

13   that happened after November 4th.   This happened -- this

14   RIF -- we call it a RIF -- happened two weeks later,

15   November 18th.   So, okay.   So it has to be part of a new

16   complaint.

17         But now, when Twitter is seeking to dismiss this new

18   complaint, it's asking the Court to put blinders on to what

19   happened two weeks earlier.   Really we're saying this is all

20   part of the same process by which Elon Musk was trying to

21   shape the new company in an image that he thought a work force

22   should be, high-intensity, hard-core.

23         From his very public comments, he has said negative things

24   about women, about older people, about other protected

25   categories of people who are all in separate complaints that

1    are pending in the Northern District of California.

2        But the point is that for purposes of this case, there's

3    no reason for the Court not to notice the allegation we made

4    that two weeks earlier a significantly large number of people

5    over 50 were laid off when he's furthering the layoffs two

6    weeks later by putting out this ultimatum.

7        And our client, who is over 50 and female and knows that

8    he's looking for this extremely hard-core working

9    80-plus-hour-a-week workers, and he's said discriminatory

10   things out there about older people as well as women, feels

11   like this is -- this is not the place -- this is not a place

12   where this boss wants me to be.

13       That's a plausible allegation about sex and age

14   discrimination.

15           **THE COURT:**  All right.  I'm just talking about the

16   age 'cause I do think that's pled differently.

17       But you're -- I don't have any problem considering

18   those -- any allegations in the complaint as to the narrative

19   of what happened.

20       Mr. Berry, as to the age discrimination.

21           **MR. BERRY:**  It -- yeah, I want to address a number of

22   things that Ms. Liss-Riordan said.  Much of what she's

23   arguing --

24                   (Simultaneous colloquy.)

25           **MS. LISS-RIORDAN:**  I'm sorry.  Just because I hear

1    this a lot.  Let me just make clear for the case.  My name is

2    Liss-Riordan.  It's the old Irish.  But it's spelled -- it's

3    like R-E-A-R.  So it's Riordan.

4                      (Simultaneous colloquy.)

5              **MR. BERRY:**  I apologize.  I mispronounced it multiple

6    times over the years.  I apologize.

7                      (Off-the-record discussion.)

8              **MR. BERRY:**  Let me --

9              **THE COURT:**  Go ahead, Mr. Berry.

10             **MR. BERRY:**  -- address a few things that

11   Ms. Liss-Riordan said.

12        Much of what she said is not in the complaint.  The -- she

13   is right that the complaint pleads in a completely conclusory

14   way that Mr. Musk was the decision-maker and responsible for

15   the -- the various decisions in the RIF and post acquisition.

16   But those aren't pleaded.

17        And some of this gets into the other cases because it's an

18   issue of RIF and the decision-makers in the RIF.  This case is

19   not about a RIF.  It is about a so-called constructive

20   termination that occurred with -- with the email.  Okay?

21        The age -- the only ageist -- so-called ageist comment

22   that the complaint references, as you note, is from 2022.  But

23   you've got to read that interview.  It's an interview about

24   asking about what would it be like with -- with new technology

25   that will extend people's lives to be 200 and something years

1    old.  So it's this sort of science-fiction-type interview

2    about what would it be like to live to be 150, 180 years old.

3    And he's commenting that that wouldn't be a great idea to have

4    leaders who were that far removed, if you're a 180 years old

5    in this hypothetical science fiction world, from the realities

6    of the people they're governing.

7        So it's the nature of that interview.  Not only was it six

8    months before the -- the acquisition of Twitter.  It has

9    nothing to do with Twitter, with employee -- with the

10   businesses generally.  It is a sort of hypothetical discussion

11   with an interviewer that, in -- in a way, references age in

12   this very attenuated circumstance.

13       It's a million miles away from something that would --

14   would constitute anecdotal evidence of age prejudice that

15   motivated the email to ask people if they wanted to continue

16   to work at -- at Twitter, now X, or not.

17       Your Honor, you also mentioned the lack of statistics.

18   One thing I wanted to press on, both on the gender and the age

19   side.  I know you want to focus on the age side, but I think

20   it overlaps with gender as well.

21       Regardless of how you might characterize the email, folks

22   had a decision to either click "yes" or not.  And hundreds and

23   hundreds, thousands of people stayed.  Some of them went.  And

24   causation gets completely broken at that point.  Right?

25       So even if Ms. Liss-Riordan had statistics on age, which

 1    aren't here, there would be no way -- or there is no way so

 2    far in the complaint that suggests that the reason that the

 3    people decided to leave the company had to do with the new

 4    policies.

 5        People could have decided to leave for all kinds of -- for

 6    all kind of reasons.  They didn't want to work at the new

 7    company for any number of reasons.  Or they had other job

 8    opportunity and this was just the time to do it.  Right?

 9        The idea that hundreds and hundreds and hundreds of people

10    who decided not to click on the email did so for the very

11    specific reasons that -- that they wanted -- they didn't want

12    to work intense hours at an office is pure speculation.  And

13    of course --

14            THE COURT:  But, Mr. Berry, on this motion to

15    dismiss, all I'm looking at is the plaintiff.  That we're not

16    arguing class certification.  An inference can be drawn that

17    they didn't -- she didn't click "yes" because of exactly what

18    she was asked and not for some other reason.  I don't -- I

19    don't understand that argument at all.

20                    (Simultaneous colloquy.)

21            THE COURT:  -- at the plaintiff.

22        MR. BERRY:  Except, Your Honor, they plead a

23    disparate impact case.  In which case they are necessarily --

24    it's a question of whether like -- like people were treated --

25    dis -- disproportionately with similarly situated people who

1   aren't in the protected class.

2        **THE COURT:**  All right.  Well, let's move -- let's

3   move to the gender then because that's -- that's where we're

4   going.

5        And this is different, I think, because as I understand

6   the plaintiff's allegation, it's that Mr. Musk presented this

7   ultimatum to the work force with the understanding or intent

8   that women would disproportionately not click "yes."

9        And she points to the statistics that show proportionally

10  more, 36 percent as opposed to 20 percent women did not click

11  "yes" and therefore were terminated.

12       And that she then identifies statements, alleged

13  statements by Mr. Musk that drawing inferences in plaintiff's

14  favor would support an inference of at least a lack of respect

15  for women or an antipathy toward women in paragraphs 37 and 38

16  to support backing up the statistics that that was the intent.

17       So why isn't that plausibly pled?

18       **MR. BERRY:**  The -- the first reason is that the --

19  the stray comments that are mentioned have no nexus to

20  employment conditions.

21       **THE COURT:**  Okay.  Let me stop you, Mr. Berry.

22       Being a mom is just as important as any career.  There is

23  a benign inference to be drawn for that for sure.  But it

24  didn't say being a parent is just as important as any career

25  or being a dad is just as important as any career.  So an

1    inference is to be drawn that it suggests that a mom, a woman,

2    is not going to be as committed to her career because being a

3    mom is just as important.

4        Now, again, just inferences having to be drawn in

5    plaintiff's favor here, not that that is in fact what was

6    intended to be communicated, but that is directly related to

7    employment, right?  Again drawing inferences in plaintiff's

8    favor.

9        **MR. BERRY:**  Not employment at Twitter.  And I think

10   those comments are -- are separated temporally and certainly

11   contextually apart other than the temporal from -- from this

12   time period.

13       **THE COURT:**  But -- by a few months but by the same

14   person who sent the email.  By the person who made the

15   ultimatum, an inference to be drawn because it's his name at

16   least that was on the email.  I mean, discovery may show

17   something else again.  We're just at the complaint.

18       But the same person, the CEO and owner, right, connects

19   those things.  Again just drawing inferences in favor.  And

20   then "Testosterone rocks not going to lie," NGL.  I think

21   that's what NGL means.

22       **MR. BERRY:**  I had to look that up, too.  That's what

23   I found as well.

24       **THE COURT:**  I had to ask.

25       **MS. LISS-RIORDAN:**  All of us folks over 50 have to --

1    have to look that one up.  Right.

2            **THE COURT:**  So, you know, those things together,

3    right, I mean that's just -- okay.  Again, just drawing

4    inferences in plaintiff's favor here.  Just drawing inferences

5    in plaintiff's favor as I must, and then all the other things

6    identified in paragraph 37 and then paragraph 39, again could

7    mean something else entirely, but the plaintiff's asking to

8    draw a certain inference which is not implausible.

9        That's why I think the gender, the sexist is different

10   from the age because I agree with you, I didn't -- that one

11   statement in paragraph 41, I didn't see those inferences that

12   the plaintiff was asking for.

13           **MS. LISS-RIORDAN:**  Can I comment on that, Your Honor?

14           **THE COURT:**  What?

15           **MS. LISS-RIORDAN:**  I said can I comment on that?  Or

16   are you still with Mr. Berry?

17           **THE COURT:**  Well, we're still on this.

18           **MS. LISS-RIORDAN:**  Okay.

19           **THE COURT:**  I just want to hear from Mr. Berry on the

20   sex.

21           **MR. BERRY:**  Yeah, I just -- I mean it gets -- you

22   know, in some ways it's a matter -- it's a matter of degree

23   removed, you know, what -- what level of removed from the

24   decision.  And I think that these are -- these are sort of

25   standard kind of stray remarks that are divorced entirely from

1    the context of when this email went out.

2        There's -- there's nothing that tethers any of these

3    remarks.  Even drawing -- drawing all inferences in favor of

4    what they might mean in plaintiff's favor, which you must in

5    this context, I think the complaint is lacking in a

6    significant way in tethering those comments to the decision to

7    put out the email.

8        And -- and that's what's lacking.  That's what's needed to

9    make them not stray comments to make, but to make them indicia

10   of intent.

11           **THE COURT:**  But it's the same person.

12           **MR. BERRY:**  Sure.  But that's the nature of a stray

13   mark -- that's the stray remark doctrine is that it's often

14   the same person but it could have been two years later or

15   something in a different context or, you know.  It's all

16   highly circum -- circumstantial.

17       But in the instance when you have comments that are being

18   made when he's not even -- he doesn't even own the company.

19   They were months or I think some instances over a year before,

20   they're not related to -- there's nothing about the comments

21   that are in time or tethered in any way to Twitter or

22   Twitter's operations or to the reductions in force that

23   happened on 11/4, much less the so-called constructive

24   discharge that we're -- we're talking about here.

25       So I -- I understand that and the posture that we -- that

1    all inferences are drawn in favor of the plaintiff.  But I

2    think still we're looking at just a smattering of stray

3    remarks that are not indicia of intent.

4            THE COURT:  You have a -- I mean this is more than

5    one remark, and this is happening within months of the layoffs

6    and after the -- the intended purchase was announced, right?

7            MR. BERRY:  Some of them were after, yes.  I'd have

8    to look at the dates of each of them.  But -- but several of

9    them were many months before.  I think one of them may have

10   been before the announcement.  But Ms. Riordan can correct me

11   if I'm wrong about that.

12           THE COURT:  Go ahead, Ms. Liss-Riordan, on the -- on

13   the sex.

14           MS. LISS-RIORDAN:  On the sex, right.  Well, I mean

15   right.  They were all -- they were all that year, I believe,

16   2022, which was -- it was through the course of the year that

17   earlier in the year he announced that he was going to buy

18   Twitter.  And then it was being talked about it.  It was being

19   talked about publicly for a number of months until it closed

20   in October.

21        So you've got temporal proximity.  You have, as you noted,

22   the actual person who sent out the email and who was the

23   ultimate decision-maker, the CEO, and the owner, harboring or

24   at least evidence of him harboring animus, bias.

25        I think for purposes of a motion to dismiss, the

 1    allegations are sufficient.

 2              **THE COURT:**  All right.

 3          **MS. LISS-RIORDAN:**  I know you wanted to talk about --

 4    can I please just go back for a moment to age?

 5              **THE COURT:**  Okay.  One moment.

 6          **MS. LISS-RIORDAN:**  Just make a couple comments on

 7    age.  Okay.

 8        All right.  So first off everything that you just said

 9    about sex, I think it applies to age also except you don't

10    think that that article sufficiently shows age animus.

11        So just a couple of things.  One is that it's highlighted

12    in the article that Elon Musk says U.S. has very ancient

13    leadership, old ideas won't advance society.

14        But also I just want to point out that age discrimination

15    cases abound in which management make comments about how we

16    need workers who are going to be more active, work longer

17    hours.  Lots of things like this are -- are come out in the

18    cases as being code for we want to get rid of the older

19    workers.

20        Again, on a motion to dismiss, factual conclusions

21    shouldn't be drawn.  Mr. Berry's arguments just now about how

22    this doesn't amount to age discrimination sounded like what

23    you would argue to a jury.  Well, look at the context of what

24    he was talking about.  He was talking about some science

25    fiction fantasy.  This can't possibly show any age

1   discriminatory animus.

2       Those are factual issues.  And the fact that you can't

3   divorce these allegations from the fact that the message being

4   sent was we need people who are going to work round the clock,

5   who are going to sleep in the office, who are going to go, go,

6   go, go and be extremely hard-core, those are allegations --

7   and in the footsteps of having just done a RIF where older

8   workers are significantly more impacted than younger workers,

9   those are sufficient allegations to state a claim for age

10  discrimination as well as sex discrimination.

11          **MR. BERRY:**  May I --

12          **THE COURT:**  Yes.

13          **MR. BERRY:**  -- add something, Judge Corley?

14      I wanted to note, in the gap I've had a chance to pull up

15  the complaint.

16      So paragraph 37, this is the -- the alleged sexist

17  remarks.  Paragraph 37 has three of them and they're dated.

18  All of them are a year or more before the acquisition and

19  months before the deal was even announced.  So they're in late

20  2021.

21      And then there -- the others, you can see the dates in --

22  in paragraph 38 where they're -- when -- when they are

23  attributed to -- to Mr. Musk.

24      But the bulk of them, the ones that in 37, the first three

25  of them were a year apart.

```
 1          THE COURT:  Yeah, but the one that addresses women
 2    and careers was months before the closing.
 3          MR. BERRY:  That's correct.
 4          THE COURT:  Yeah.  Okay.
 5       All right.  So the disparate impact they allege, right, a
 6    statistical disparate impact that a higher percentage of women
 7    than men did not click "yes" in response to the ultimatum.
 8    And so I'm not quite sure why that's not sufficient at this
 9    stage to allege a sex disparate impact claim.
10          MR. BERRY:  Well, one is they're -- they're related
11    of course.  The statistics in these contexts, you know, it
12    really -- the existence of a disparity and causation kind of
13    run together.
14       But I'll address causation first as that what we're
15    talking about here are -- there's no question that there was a
16    voluntary decision.  I mean we can dispute whether there was a
17    so-called mass constructive discharge, which is, you know,
18    I -- there may be some other case out there of such a thing.
19    This may be the first one that's ever been filed but --
20          THE COURT:  I think it's termination.
21                 (Simultaneous colloquy.)
22          MR. BERRY:  Pardon?
23          THE COURT:  I think it's a termination.  Check this
24    box or you're fired.
25          MR. BERRY:  Lots and lots of people did -- lots and
```

1    and lots of people elected to check the box and to remain

2    employed.  Hundreds, thousands of people did so.  Okay?

3        So there are a number of people who are separated.  And

4    whether we call that a constructive discharge or a

5    termination, a separation, for now the question for disparate

6    impact is how can you trace -- trace an isolated and

7    identified policy.

8        Here would be multiple policies, actually.  One of the

9    policies is working -- I'm not sure exactly how you count

10   them, but one of the policies at least has to do with working

11   long hours.

12       Another one, maybe it's the same, maybe it a different

13   one, is working intensely.  And another one is working at a

14   physical office.

15       So maybe that's two, maybe that's three policies.  But --

16   and the -- the statistics that are offered don't map onto why

17   people did -- decided or separated because they didn't want to

18   do one of them, two of them, three of them, or something --

19   something completely unrelated.

20       There's no reason to think -- there's nothing in the

21   complaint that suggests that all of the people who are

22   represented by those statistics separated from the company

23   because of those policies.  That is pure speculation that's

24   not in the complaint no matter how much -- how much latitude

25   we give on a -- on a Rule 12 motion to a pleading.

 1          **THE COURT:**  All right.  Ms. Liss-Riordan?

 2          **MS. LISS-RIORDAN:**  Yes.  So just a couple of points.

 3  Big -- big picture points here.

 4      On a complaint, a plaintiff doesn't have to specify what

 5  legal framework they will ultimately use to prove their case,

 6  whether it will be disparate treatment or disparate impact.

 7  Sometimes it's obvious from the face of a complaint whether

 8  it's disparate treatment being alleged versus disparate impact

 9  being alleged.

10      But it's not like we have count one disparate treatment,

11  count two disparate impact.  Those are two different ways you

12  can show discrimination.

13      And use of statistics is frequently used for both

14  disparate treatment claims as well as disparate impact claims.

15  And also statistics aren't required at the complaint stage

16  because oftentimes plaintiffs don't have those statistics at

17  the complaint stage.

18      So that is why, yes, the fact that we have the statistics

19  on sex helps bolster the sex discrimination claim, I would say

20  both -- whether it's -- whether it's ultimately pursued as a

21  disparate treatment or disparate impact claim or both.  It's

22  not necessary, however, so the fact that we don't have the

23  statistics on age, it's not -- once again Twitter is trying to

24  parse this out and slice and dice, and it just doesn't need to

25  be done at the pleading stage.

1        We'll do discovery.  And ultimately after that, they may

2   move for summary judgment or it may just go to trial.  And at

3   that point, there will be the question of whether plaintiff

4   can carry her burden.

5        But you don't have to decide at the outset can plaintiff

6   pursue this as a disparate treatment or disparate impact case

7   and what --

8                      (Simultaneous colloquy.)

9        **MS. LISS-RIORDAN:**  -- just need -- the statistics

10  don't, A, are helpful but not necessary and are not limited to

11  disparate impact allegations.

12       So I'm just saying there's no need to parse that at this

13  point.

14           **THE COURT:**  What case would I look at to say that if

15  you're -- if you want to pursue discovery of a disparate

16  impact claim, you don't have to plausibly plead a disparate

17  impact claim provided you plausibly plead at least a disparate

18  treatment claim?

19           **MS. LISS-RIORDAN:**  Well, there's a case that I

20  recently argued at the Ninth Circuit that I'm waiting for a

21  decision on any day which I'm hoping to be able to cite for

22  you, but it hasn't been issued yet.

23                      (Simultaneous colloquy.)

24           **THE COURT:**  Are you the appellant?

25           **MS. LISS-RIORDAN:**  Yes.

```
 1              THE COURT:  Are you the appellant?

 2              MS. LISS-RIORDAN:  I am, yes.  Yes.

 3                   (Simultaneous colloquy.)

 4              MS. LISS-RIORDAN:  We have a lot of case law we

 5     cited.

 6              THE COURT:  But the District Court --

 7                   (Simultaneous colloquy.)

 8              MS. LISS-RIORDAN:  It was a different -- that was a

 9     different situation where we had -- we had statistics, and the

10     District Court still threw out the disparate impact

11     allegations, we believe very wrongfully.  But anyway we'll see

12     what the Ninth Circuit says.

13        My point is, is that we didn't in this case say point one,

14     disparate treatment, point two, disparate impact, and so

15     Twitter is now moving to dismiss count two.

16        I'm just saying we've -- we've alleged sex discrimination,

17     age description, and the Court can either allow or not allow

18     us to move forward with discovery on the sex discrimination

19     and age discrimination claims.

20              MR. BERRY:  May I address that, Judge Corley?

21              THE COURT:  Yes, please.

22              MR. BERRY:  Yeah.  I -- I think Ms. Liss-Riordan's

23     argument is conflating a cause of action with a claim.  And so

24     it is true that the cause of action is styled as a

25     discrimination cause of action.  But a disparate impact claim
```

1    and a disparate treatment claim are very different.  They're

2    fundamentally different.  They have different prima facie

3    elements.  And routinely, I think even in this case -- in

4    these other cases, in *Strifling* and in *Zeman, Zeman* in

5    particular.  I mean those courts, even -- even in these sort

6    of similar cases, are analyzing them separately.  And I think

7    that's standard for courts to do because they are very

8    different claims even though they fall under the rubric of,

9    you know, Title VII FEHA, or however you're -- you're stating

10   a cause of action.  So that's the first thing.

11       I think that Ms. Liss-Riordan is right as a technical

12   matter that you need not in every case have statistics or

13   comparative figures in order to plead a disparate impact

14   claim.  But you must have sufficient allegations to draw a

15   plausible inference of a statistically significant disparity.

16       The more convenient way to do it, if the plaintiff has the

17   statistics, is to plead those.  But there are other ways to do

18   it.  And it's not always easy.  And, Judge Corley, I know

19   you've recognized that in other cases I've had before you.

20   It's not easy to -- to plead a disparate impact claim for that

21   reason.

22       I'll also mention in this context -- this goes back to the

23   point of causation -- statistics, raw statistics, bottom-line

24   statistics are going to be -- should be viewed with very much

25   a jaundiced eye, if not with entire skepticism, when the

1    context of the pleading is that this was a decision that was

2    put to the work force and there is nothing -- there is no --

3    there is no specific policy or practice that has been

4    identified that maps in any way onto those -- those putative

5    statistics that are in the complaint.

6        That would be just pure speculation.  And so a

7    fundamental --

8            **THE COURT:**  I don't understand.  I don't understand

9    that argument, Mr. Berry.  You keep making it.  I don't

10   understand it.  They were given an ultimatum: By 5:00 p.m.

11   tomorrow click "yes" on this box or you're fired.

12       And click "yes" on this box that you want to be extreme

13   hard-core, which the plaintiff I think can -- an inference can

14   be drawn means seven days a week, 12 hours a day, maybe

15   sleeping overnight, like extreme hard-core long work hours.

16   That's the policy.

17       And you had to click "yes" that you were willing to do

18   that or you were fired.

19       And 36 percent of the women employees did not click "yes."

20   28 percent of the male, as alleged -- as alleged, did not

21   click "yes."  So a greater percentage, which quite honestly,

22   although it's not alleged in the complaint, probably surprises

23   no one.

24           **MR. BERRY:**  Yeah.  So I -- I don't think -- I don't

25   think that the -- when -- when we're talking about adverse

1    employment actions, it's -- it's -- it's typically actions

2    that are taken by the employer.  Right.  It's an adverse

3    employment action.  You have this -- the circumstance here

4    where it's alleged a constructive discharge, I understand Your

5    Honor is receptive to -- to characterizing it as a

6    termination.

7        But in any -- in any event, for a disparate impact claim

8    to have legs, there has to be plausible allegations that it is

9    tied to a particular policy or practice.  And that's -- that

10   can't be true here when -- when the work force had a choice to

11   make.  They could have chosen not to work there for any number

12   of reasons.

13       I -- I'm guessing, I don't know, but there could have been

14   a lot of people who had other jobs and were just waiting for

15   an opportunity to leave and decided not -- and decided to

16   leave in that week, decided not to click on the box.  It had

17   nothing to do with --

18           **THE COURT:**  Just coincidentally?

19       **MR. BERRY:**  Sure.  There could be all kinds of

20   reasons why people --

21           **THE COURT:**  That's fine, Mr. Berry.  You're asking me

22   to draw inferences in Twitter's favor.  This is not a motion

23   to dismiss argument that you're making.  At least I don't

24   understand it.  I know you've been making it the whole

25   hearing, and I honestly don't understand it as a 12(b)(6)

1     argument at all.

2        I mean, they were told here's the policy.  You have to be

3     extreme hard-core, long hours, click the box "yes," you'll do

4     it.  They didn't click the box so they were terminated the

5     next day.  That seems to me there's an inference to be drawn

6     there.

7        You know, maybe you're right.  There could be other

8     reasons.  But now you're asking me to draw inferences in

9     Twitter's favor.  I don't -- yeah, I just really don't

10    understand that argument.  But okay.  All right.

11       But I do, Ms. Liss-Riordan, do not understand the

12    argument.  Your counts include disparate treatment

13    intentionally, and then open paren, or unintentionally, close

14    paren, which Twitter and I interpret to mean you were trying

15    to plead both.  But -- so you're right, I guess the count

16    could survive if you plead one or the other, but it's not that

17    both theories survive.

18       **MS. LISS-RIORDAN:**  Your -- Your Honor, I'm -- I'm

19    really sorry.  I'm trying -- I have on the tip of my tongue

20    the Supreme Court case, and I'm trying to find the name of it.

21    I believe it's starts with a T.  But I'm trying to get it for

22    you.

23       But you had asked.  There is Supreme Court case, a

24    disparate impact case that says that the bottom-line

25    statistics are not even necessary to show a disparate impact

1    case if somewhere along the way, there is discrimination.

2    Even if it doesn't manifest itself in the ultimate statistics,

3    you could still have disparate impact discrimination.

4        You may know what case I'm talking about.  It's a seminal

5    case.  I just can't remember it off the top of my head.  I can

6    get you the cite for it later if you'd like.

7        But that's further reason why our not having statistics in

8    the complaint about the ultimate impact of this ultimatum

9    on -- as it affected age is not fatal to this complaint at the

10   pleading stage.

11           **THE COURT:**  Even Mr. Berry said that.  You don't

12   necessarily have to have statistics.

13       The question is whether you have pled facts that plausibly

14   support an inference of a disparate impact.  That's -- that's

15   all.

16                   (Simultaneous colloquy.)

17           **THE COURT:**  However --

18           **MS. LISS-RIORDAN:**  Well, let me -- right, right.  So

19   part of the plausible impact is once again that just as we've

20   alleged that Mr. Musk was trying to further the layoffs

21   through this ultimatum to target more women, based both on his

22   discriminatory animus towards women, as well as him trying to

23   shape a work force that was more willing to be hard-core, more

24   male, younger, an inference can be drawn that he was doing

25   this to weed out all of those older workers who weren't going

1      to work 84 hours a week and sleep in the office.

2          And that you can see that as a disparate treatment

3      intentional or disparate impact unintentional because, well,

4      if he was putting forth new requirements that were going to,

5      may have intentionally, may have unintentionally weeded out

6      more older workers, that is a sufficient allegation of age

7      discrimination.

8              THE COURT:  Well, because are you saying that older

9      workers are less likely -- because you don't allege this --

10     older workers are less likely to be willing to work those

11     types of hours?

12             MS. LISS-RIORDAN:  That is an inference that can be

13     drawn.  And as I said that's --

14             THE COURT:  How?

15             MS. LISS-RIORDAN:  -- throughout age discrimination

16     cases.

17             THE COURT:  How?  Where?

18             MS. LISS-RIORDAN:  That is just common in age

19     discrimination cases.  It's not something that we have to

20     allege.  It's just -- just as there are societal

21     understandings that trying to require this kind of intense

22     work ethic from your work force is going to have a disparate

23     impact on women, who are expected to be more responsible for

24     caretaker responsibilities and other reasons that women are

25     expected not to be as committed to their careers as men, the

1    same societal assumptions can come into play with respect to

2    older workers as compared to younger workers.

3        And, again, the age discrimination cases are full of such

4    types of inferences.  And those are the kinds of things juries

5    look at when they're evaluating age discrimination, whether

6    age discrimination existed, without me having to spell out

7    saying that older workers are understood to be less likely to

8    accept these extremely hard-core conditions that Musk put

9    forth.

10        We said that Musk put forth these conditions because he

11   wanted to get rid of more older workers and female workers.

12   And whether or not he himself even realized that, that was

13   the -- that was the effect, to push out older and younger --

14   older and female workers.

15             **MR. BERRY:**  There's --

16             **THE COURT:**  All right.

17             **MR. BERRY:**  -- really nothing in the record at all --

18   again, granted that not every case requires statistics.

19   There's nothing in the record at all to suggest there's any

20   disparity with respect to age.

21        And it seems like what Ms. Liss-Riordan is asking to do

22   the work is this -- its own kind of bias that people who are

23   over 40 or 50 in this case don't want to work long hours.

24        I mean I think there are a lot of people who were -- who

25   burn the midnight oil at least as well, if not better, when

1    they're 40 or 50 than when they were 25, for a variety of

2    reasons.

3       And I don't think for purposes of pleading, again, giving

4    all -- you know, all the inferences in favor of the plaintiff,

5    we can engraft onto it what's being characterized as societal

6    assumption that older -- that older workers can't work as long

7    hours or as intensely as younger workers.

8       I don't think that's a societal assumption.  It's not one

9    I share.  It's not one I've seen in the literature.  In any

10    event, it's not pleaded and it shouldn't be engrafted onto the

11    complaint here.

12          **THE COURT:**  Okay.  All right.  Thank you for the

13    argument.  It was very helpful.  And I will issue an opinion.

14    I'll go back and look again at all those cases.  Thank you.

15          **MR. BERRY:**  Thank you, Your Honor.

16          **MS. LISS-RIORDAN:**  Thank you, Your Honor.

17       (Proceedings were concluded at 10:52 A.M.)

18               --o0o--

19

20

21

22

23

24

25

1

2

3                      <u>**CERTIFICATE OF REPORTER**</u>

4

5           I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7    I further certify that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in which this

9    hearing was taken, and further that I am not financially nor

10   otherwise interested in the outcome of the action.

11

12   _____

13          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

14                 Wednesday, August 14, 2024

15

16

17

18

19

20

21

22

23

24

25